THE DEPARTMENT OF CONSERVATION, Plaintiff-Appellee, *v.* ASPEGREN FINANCIAL CORPORATION, Defendant-Appellant.

Second District No. 76-296

Opinion filed March 11, 1977.—Rehearing denied May 2, 1977.

Arlene C. Erlebacher and Robert A. Downing, both of Sidley & Austin, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Frank S. Righeimer, Jr., and Leo M. Cinquino, Assistant Attorneys General, of counsel), for appellee.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

This is a condemnation case. The jury awarded the defendant, Aspegren Financial Corporation, $275,272, or about $1,710 per acre, as just compensation for its property. Aspegren appeals from this verdict as being inadequate and alleges the trial court erred as follows: (1) in allowing the State to introduce into evidence the purchase price paid by Aspegren when it bought the land in question in December 1970. (The condemnation petition was filed in July of 1974, about 3½ years later.); (2) in permitting the State to show as comparable sales certain sales of nearby lands which were flat and unwooded and not comparable to the rolling and wooded land being condemned; (3) in erroneously excluding certain "comparable sales" offered by the defendant; (4) in not permitting the defendant to offer into evidence certain plans for the contemplated development of the property in question and the fact that the State's

announcement of the proposed condemnation in 1971 had the effect of forestalling such development; (5) in not permitting the defendant to introduce evidence of the probability of rezoning of the property to permit a cluster-type residential-recreational development, and (6) in ruling that a certain amendment of the McHenry County Zoning Ordinance dated May 17, 1974, might be considered in evaluating the subject property.

The property condemned is just west of the Fox River, south of Route 173 and adjacent to Chain O' Lakes State Park, being about one-half in Lake County and one-half in McHenry County. It consists of 160 acres, is rolling on the west and flat on the east and is about 25 to 30 percent wooded. It is zoned Agricultural in Lake County and Farming in McHenry County. About 20 to 25 acres are mucky and not suitable for building. There is no water or sewer facility within several miles and it was conceded that these facilities could be supplied only by well and septic tank. The property is part of a larger tract of about 360 acres which belonged to the Carey family. The Carey heirs were getting along in years and wanted to sell the whole 360 acres. They offered it for sale in a single parcel at a price of $2,500 per acre but it did not sell, and they reduced the price to $1,500 per acre, and eventually to $1,200 per acre. In 1970 they lowered the price to $1,000 per acre. Aspegren inspected the property at that time but did not want the whole 360 acres and did not buy it. Soon after that, however, two other persons offered $1,000 per acre for the 200 acres Aspegren was not interested in (because it was flat and not wooded). The Careys then offered to sell the 160 acres remaining to Aspegren for the difference between what the other buyer would pay and the $360,000 price which they were finally asking for the entire parcel. Thus, Aspegren bought the 160-acre tract in question for $162,000, or a little over $1,000 per acre, in December of 1970.

Aspegren testified that he had planned to develop the property into a "residential-recreation" type of community with special emphasis on horseback riding, thus making it attractive to persons who owned or rode horses. He hired a planner to develop a plan for the property, taking advantage of the slopes and the trees and in December of 1970, he attended a meeting with planning officials of both McHenry and Lake Counties, at which he outlined his plan. According to Aspegren the proposed plan received an enthusiastic response from these planning officials.

The following month, in January 1971, the Governor announced plans for expanding Chain O' Lakes State Park to include the condemned property here in question. Aspegren testified that after confirming that his property would definitely be taken he abandoned any further plans for its development and began searching for a replacement property. In April

1972, he testified, he found a tract of approximately 327 acres which was compatable with his proposed plan of development and he acquired this tract at a price of $5,500 per acre. This property was about 22 miles by road—15 miles by air—from the condemned land and was about one quarter of a mile from the city limits of Mundelein. It was served by county water and there were sewer facilities available from Mundelein. Testimony indicated that as compared with the condemned land, the new tract was in a much more heavily populated, developed and industrialized area and real estate values were admittedly higher in that area.

At the trial Aspegren contended it was error for the State to be allowed to disclose the price he paid for the condemned land in December 1970. He admits that Illinois cases allow such evidence but only where it is indicative of the present market value. He argues that where conditions in the real estate market have changed in the meantime and prices are generally higher than at the time of the original purchase, it is error to allow such evidence because, under such circumstances, the purchase price has no probative value and is prejudicial.

■■ The general rule is set forth in the often cited case of *Forest Preserve District v. Krol* (1957), 12 Ill. 2d 139, 147, wherein the court said:

> "When a parcel of land is taken by eminent domain, the price the owner paid for it is a fact which may be considered in determining its value, provided the sale was recent and was a voluntary transaction, with no change in conditions or marked fluctuation in values having occurred since the sale."

See also *Forest Preserve District v. Hahn* (1930), 341 Ill. 599; *Village of Broadview v. Dianish* (1929), 335 Ill. 299; *Forest Preserve District v. Folta* (1941), 377 Ill. 158; *Morton Grove Park District v. American National Bank & Trust Co.* (1976), 39 Ill. App. 3d 426.

Aspegren contends there was a sharp advance in real estate prices between 1970 and 1974 and therefore the original price has no relevance to the just compensation in July 1974, when the condemnation petition was filed. The State, on the other hand, submitted evidence refuting this upward trend in prices and tending to show that the price of similar land in the immediate area had advanced only slightly during the 3½ years in question.

■■ It is, of course, the burden of the State to prove that the compensation it is offering is just, where an offer has been made and refused. On the other hand, in view of the settled law as indicated above, it is the burden of the landowner to establish that the conditions of the market have changed where he challenges the probative value of the previous price paid for the property. It was more or less conceded that the period of time—3½ years—was not too remote, but the defendant

attempted to show that land prices had increased sharply during this period, thus impugning the relevancy of the original sale. He introduced evidence of sales which he contended were comparable which indicated the price per acre ranged from $3,000 to $5,000 per acre at the time of the condemnation. However, the State countered this evidence by offering proof of sales it claimed to be comparable which showed there had been little increase in that particular area in the price for vacant land. Because of the sharp disagreement in the evidence as to the trend of prices in the immediate area of the condemned land and allowing some increase for the abnormal inflation which occurred during this period, we think the claim of a tremendous increase in the prices of comparable land in the immediate area was not so persuasive as to disqualify this sale as probative evidence. While the defendant's witnesses made general statements as to a sharp increase in prices, little specific and competent evidence was evinced to bear this out.

In evaluating this evidence the trial court was faced with a sharp disagreement between the parties as to what was truly a comparable sale. The State offered a number of sales it claimed were comparable. Three of these were ruled out by the court. One of those accepted was a 46-acre tract within two miles of the property condemned which sold in May 1974 for $1,300 per acre. It was partly wooded. The defendant objected to this evidence on the ground the land was simply an ordinary working farm, flat in topography, hence not comparable to the land condemned, whose slope from west to east and rolling topography made it more attractive for development. In addition, a 9-acre tract which had originally belonged to the 46 acres was sold at a much higher price than $1,300 per acre. The trial court would not allow the whole 55 acres to be treated as a unit, however, since the 9-acre tract had a house on it which the seller had greatly improved, thus the court ruled, making it not part of a comparable sale. The second comparable sale offered by the State was a 120-acre tract, 20 acres of which were wooded, within two miles of the subject property, and having a rolling topography. It sold in April 1972 for $1,000 per acre. The defendant objected to its comparability, however, arguing that it was 80 percent in a flood plain. The State's evidence indicated this was not true but that it merely had a flood ditch along 80 percent of its frontage. That question was not resolved. The defendant also objected that in any event it was a "working farm" and not suited to the type of development the defendant intended. Moreover, as the defendant revealed on cross-examination, this property was subsequently divided into a 40-acre and an 80-acre tract and was sold later the same year for $1,500 per acre, an increase of 50 percent in less than a year. The State pointed out, however, that the division of the tract into two smaller tracts, would naturally increase the price per acre and

offered evidence of an expert to this effect. It may be noted that in any event the price of $1,500 per acre was far below the $3,000 to $3,500 per acre valuation claimed by the defendant's expert.

The third comparable sale was of a 122-acre tract of which 40 acres were wooded. This tract, however, was sold in December 1970. While the price was only $900 per acre, it would have no more probative value than the sale of the condemned land itself.

■■ While the property involved in the comparable sales offered by the State may have been less desirable in meeting the qualifications of the defendant for his particular concept of a horse-oriented residential and recreational area, we think the land in question, being in the immediate area, and zoned the same, was not excludable on that ground. The test is market value and the defendant's subjective test as to what suited him best for a particular purpose and a particular kind of development is not controlling as to what is a comparable sale. We see no abuse of discretion in allowing the jury to consider the sales in question as evidence of the market value of the property condemned, even though Mr. Aspegren might not have wished to purchase it for his particular purpose.

Aspegren attempted to introduce two comparable sales—one his own subsequent purchase near Mundelein in April 1972, of a 327-acre tract for $5,500 per acre and the other an uncompleted sale of a 213-acre tract only one-half mile from the subject property on which a contract was prepared at $5,000 per acre in 1974 and actually signed. However, this sale was never consummated because the State filed its condemnation petition about a month after the contract was signed.

Neither of these offered sales was admitted by the trial court. The court rejected the Mundelein property as not being comparable because of its distance from the condemned property—22 miles by road—and as having features which the condemned land lacked which would enhance its value such as proximity of water and sewer, besides being in a generally more populated and developed area where prices of real estate were admittedly higher than in the dairy farm country where the condemned property was situated.

The court rejected the second offered comparable sale on the ground that it was not actually a sale since it was never consummated and in any event the price was not evidence of actual value because of qualifications attached to the contract. There was also a difference in zoning. The trial court noted in connection with the second comparable sale that (1) the property was zoned C-R (commercial-recreational) whereas the subject property was zoned agricultural-residential, thus allowing the offered property more flexibility in development; (2) the seller had the right to continue using the property until it was paid for; (3) certain easements were granted to the seller by the contract; (4) the seller was

allowed to continue the mining of gravel; (5) a conditional release was provided in the event financing was not obtained; (6) there was a question as to whether the parties were actually bound under the contract because the property was in trust and there was some question about the identification of the sellers and their authority to sign the contract; (7) there was a provision holding the money paid on the contract in escrow to be returned to the buyers if condemnation proceedings were instituted prior to final payment date. At that time the imminence of a condemnation of the land in question was well known. Moreover, only $1,000 was paid as earnest money, an amount too small to indicate a serious, binding contract. For all these reasons the trial court refused to allow this contract to go to the jury as a comparable sale.

■■ We think this ruling had a rational basis and was well within the trial court's discretion. While a contract of sale and even a bona fide offer to buy has been held admissible as evidence of value under certain circumstances—see *City of Chicago v. Building Corp.* (1957), 11 Ill. 2d 431, and *Department of Public Works & Buildings v. Lankford* (1965), 65 Ill. App. 2d 133, the cases on this point emphasize that the admission of a mere contract of sale or offer to buy is strictly within the discretion of the trial court. In *Department of Public Works & Buildings v. Lambert* (1952), 411 Ill. 183, 191, the court said in this connection:

"The question whether the evidence should be admitted is one involving the discretion of the court, and the decision of the court upon the preliminary question will not be disturbed unless it is manifestly against the weight of the evidence. The burden is upon the party seeking to have such evidence admitted to establish a sufficient foundation by showing that the offer was *bona fide* and made by a person able to comply with the offer if it were accepted."

Considering the conditions and qualifications of the contract in this case we see no abuse of discretion by the trial court in rejecting it as a comparable *sale*.

The defendant's offer of certain development plans was, we think, properly denied. He contended he should be allowed to introduce these plans to show the distinctive characteristics of the land which he intended to exploit, making it more valuable than other adjacent land and that he had been frustrated in so developing the land through the State's premature announcement of its plans to condemn the area in question. This contention was advanced and rejected in *Eckhoff v. Forest Preserve District* (1941), 377 Ill. 208, and in *Chicago Housing Authority v. Lamar* (1961), 21 Ill. 2d 362. These decisions were sustained in *City of Chicago v. Loitz* (1975), 61 Ill. 2d 92.

■■ ■ We think it would be farfetched to say that the defendant's

plans—which were only a preliminary concept—should be considered as a basis for establishing a unique value in the condemned land, or that the immediate abandonment of these plans following the State's announcement of an intention to condemn, was the State's responsibility, and an element of damage in the eventual taking. The flexibility required for good public planning should not be inhibited by such remote and consequential considerations. See *City of Chicago v. Loitz* (1975), 61 Ill. 2d 92.

A more difficult point raised by the defendant concerns the evidence he offered as to the probability of rezoning—a probability which, as has been held in several cases—can properly be considered by the jury as affecting market value of the condemned property (*Department of Public Works & Buildings v. Rogers* (1968), 39 Ill. 2d 109; *Department of Transportation v. Western National Bank* (1976), 63 Ill. 2d 179). In the case before us, however, *none* of the defendant's witnesses testified as to the probability of rezoning of the condemned property. Defendant's witness, May, testified the highest and best use was for "estate development"—covered by existing zoning. Defendant's witness, Dreher, testified that the highest and best use was "residential, recreational," covered by existing zoning. The defense witness, McCann, testified the same. None of the defendant's witnesses based their opinion as to value on the probability of rezoning or expressed any opinion as to such probability. The defendant nevertheless contends the trial court erred in excluding evidence indicating a reasonable probability of rezoning the subject property based on (a) Aspegren's meeting with certain zoning officials of Lake and McHenry Counties immediately after his purchase of the condemned property and (b) various records of meetings of the county board of both Lake and McHenry Counties granting zoning reclassifications of property within several miles of the land in question from 1969 to 1975. These included changes from farming to business, from farming to light industrial, from farming to recreational, in McHenry County, and from agricultural to suburban residential, from agricultural to commercial service, from agricultural to community business, from agricultural to commercial recreation, from agricultural to limited industrial, from agricultural to intensive industrial and from suburban residential to highway commercial and to community business, in Lake County. There was no record of a change from agricultural or farming to planned unit development.

Both the evidence of the meeting with the zoning officials and the record of favorable actions on zoning changes by the county boards of Lake and McHenry Counties, appear to have been offered to indicate the reasonable probability of the rezoning of the subject property had it been so requested.

■■ As to the evidence regarding a meeting with county zoning

officials, we think it was plainly inadmissible. The mere attendance at the meeting was actually all that defendant could testify to. The defendant's impression that the reception of the plans he submitted to them had been favorable would be hearsay and the county officials themselves were not called and could not properly have expressed any opinion as to the probability of rezoning if they had been. (*Lombard Park District v. Chicago Title & Trust Co.* (1968), 103 Ill. App. 2d 1.) The evidence offered in the form of notes concerning the various aspects of the discussions at that meeting were not in any way probative as to the probability of rezoning and we find no abuse of discretion by the trial court in rejecting this evidence as showing the probability of rezoning the subject property.

■■ The evidence of changes which were granted to various applicants was, of course, offered for the purpose of showing that there was flexibility in the administration of the county zoning laws. This is a perfectly legitimate purpose (*Department of Public Works & Buildings v. Rogers* (1968), 39 Ill. 2d 109), but the question that then arises is whether the evidence of certain county zoning changes was relevant and proper evidence at the stage of the proceedings at which it was offered. As noted above, none of the witnesses for the defendant testified as to a valuation based on rezoning the property for a more intense use of the land, and the court ruled that the zoning changes allowed by the two counties within a 10-mile radius of the condemned property were not proper evidence of such probability of rezoning standing by themselves. In the court's opinion the exhibits were irrelevant where no valuation dependent on the probability of rezoning had been advanced by the defendant. As the trial judge remarked:

"* * * [T]he motion is denied because in and of themselves [the exhibits as to the zoning changes] they are of no value and there is no witness that is—no valuation witness that's using them as an element of or a basis for his opinion."

We cannot assume that the failure of the defendant's witnesses to offer any opinion as to the increased value due to the possibility of rezoning to a more intense use was inadvertent. As a practical matter the probability of rezoning to a more concentrated form of development, such as a planned unit development, was almost nil from a practical standpoint in Lake County because of the requirements as to area (160 acres required in Lake County whereas only 80 acres were available) and the necessity of community sewer and water, which was not readily available. In McHenry County the amended ordinance of May 1974 required five acres per residential unit which was not practicable considering the area of the condemned land within that county. Planned Unit Developments are apparently not provided for in the McHenry County zoning ordinance. It

is noted that no application for a change from residential to a more sophisticated form of residential development, such as a planned unit development, was included in the offered exhibit of zoning changes for either county.

■■ We think the trial court's decision, to exclude the offered exhibits as not being helpful to the jury for lack of proper foundation, was correct and was within its discretion. In any event, we doubt the defendant was prejudiced by that ruling. The probability of rezoning is meaningless except as related to an enhancement of value thereby, and in view of the practical difficulties standing in the defendant's way after a rezoning to another allowable residential use, we doubt the jury would have been persuaded that rezoning would have greatly enhanced the value of the property.

The defendant contends that the amended McHenry County zoning ordinance passed in May of 1974 should not have been held to be applicable to the requirements for the property condemned since the property was purchased under the former zoning ordinance and was under its less stringent limitations from December of 1970 to May of 1974, and under the stricter regulations only for two months before the petition to condemn was filed. The new ordinance changed the lot size requirements for home sites in the area in question to five acres instead of the previous 48,000 square feet. This change considerably diminished the profitability of developing the property for residential purposes since it limited the number of home sites available for development.

■■ It has always been held, so far as we know, in Illinois (except for one very special case) that the date of filing of the petition to condemn is the proper date of valuation of the property. It would seem, therefore, that a zoning change affecting the land condemned, filed previous to the petition, would logically be considered in determining the land value for condemnation purposes. (See *Chicago Housing Authority v. Lamar* (1961), 21 Ill. 2d 362; *Trustees of Schools v. First National Bank* (1971), 49 Ill. 2d 408; *City of Chicago v. Loitz* (1975), 61 Ill. 2d 92.) The exceptional case of *Illinois Cities Water Co. v. Mt. Vernon* (1957), 11 Ill. 2d 547, does not affect the general rule invoked here. That case involved the condemnation of a privately owned water works operating as a public utility under a certificate of public convenience and necessity. Since it was required as a public utility to continue during the litigation which arose over the condemnation, to extend its service and to acquire additional equipment and facilities, after the condemnation petition was filed, the court held there was in that case an exception to the general rule and that the utility had a right to be compensated for the value of "after acquired property." Obviously, the case before us is not affected by the peculiar circumstances of the *Mt. Vernon* case. We think the trial court correctly

ruled that the zoning amendment of May 1974 could be considered as applying to the property here condemned.

■■■ Two other points mentioned in the defendant's brief do not require extended comment. The defendant contends that the trial court erred in refusing to allow the introduction of a drawing prepared by a professional land planner which purported to demonstrate the feasibility of developing the property in conformance with the amendment to the McHenry County zoning ordinance. This was objected to by the State because it had been prepared the night before the trial, was not shown to the State before its presentation to the court and was prepared solely for trial purposes. The presentation of this document was too late to comply with the court's order regarding discovery of land plans, land use studies, plats, maps and so forth. Moreover, it was a speculative use since the land had never been subdivided or platted and under the standard enunciated by this court in *Park District v. La Salle National Bank* (1976), 36 Ill. App. 3d 146, we think the court was properly within its discretion in excluding it from the jury's consideration.

■■■ The defendant also complained that the State in its closing argument improperly inferred that Aspegren was a land speculator who never intended to develop the property in question. We do not consider this argument inasmuch as apparently no objection was made at the time of the argument and the trial court had no opportunity to rule thereon. Since the closing arguments of counsel were not transcribed, they are not before us as part of this record and cannot be considered. *Department of Public Works & Buildings v. Anastoplo* (1958), 14 Ill. 2d 216.

This case was ably tried on both sides. The record reveals all points in dispute were well argued and conscientiously considered and ruled on by the court in the exercise of its discretion. The condemned land was viewed by the jury and while the verdict was slightly less per acre than one of the State's witnesses valued the property at, it was well within the range of the testimony, which varied from $1,500 per acre to $3,500 per acre. There is no indication that passion or prejudice of any kind played any part in the jury's verdict, and we see no palpable error. Much is said in the defendant's brief about the exclusion of certain evidence and the inclusion of other evidence offered by the State. We do not find any of these rulings to be either clearly erroneous or of such gravity as to merit reversal of the jury's verdict in any case.

As was said by our Supreme Court in *Trustees of Schools v. LaSalle National Bank* (1961), 21 Ill. 2d 552, 557:

> "We have held in other eminent domain actions that where there are other witnesses and evidence as to value on both sides, even the improper admission (*Trustees of Schools v. Kirane*, 5 Ill. 2d 64) or the improper exclusion (*Forest Preserve District of Cook County*

*v. Krol,* 12 Ill. 2d 139,) of value evidence does not constitute reversible error where the jury has the opportunity of weighing the conflicting evidence admitted on behalf of both sides."

We are satisfied that this case was well and fairly tried and there was no error requiring reversal of the verdict.

The judgment of the circuit court of McHenry County is affirmed.

Affirmed.

SEIDENFELD and GUILD, JJ., concur.