LAKE COUNTY FOREST PRESERVE DISTRICT, Plaintiff-Appellant, *v.*
LASZLO FRECSKA *et al.*, Defendants-Appellees.

Second District   No. 79-277

Opinion filed June 27, 1980.

Henry C. Tonigan, III, and Donald T. Morrison, both of Morrison & Nemanich, of Waukegan, for appellant.

John T. McGarry, Ltd., of Chicago, for appellees.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

This is an appeal by plaintiff, Lake County Forest Preserve District, from an order entered on a verdict which found the just compensation in a condemnation to be $30,000 for the taking and $10,000 for damages to the remainder. Plaintiff filed a petition to condemn a part of the subject property owned by defendant Laszlo Frecska *et al.*, on July 5, 1974; it is located in the village of Riverwoods, Lake County, Illinois, on the east side of Milwaukee Avenue, and is comprised of an 11-acre irregular shaped vacant piece of land zoned for single-family residential use with 91 feet of frontage on Milwaukee Avenue. The portion to be condemned consists of the rear six acres of which approximately 3 2/3 acres are located in the flood plain and abuts the Des Plaines River. A substantial portion of the subject property was at one time used as a sanitary landfill.

Plaintiff stipulated that the defendant could retain utility easements across the take.

At the commencement of trial the jury was given the opportunity to view the subject property. Plaintiff's first expert witness, Mr. Richard L. Thacker, a registered land surveyor and professional engineer, testified that, based on his own topographical survey of the site, it was his opinion that approximately 3.67 acres of the property to be taken were within the flood plain of the Des Plaines River.

Mr. Joseph Koenen, a civil engineer, testified that based on the results of soil borings which his company made on the subject property, it was his opinion that the majority of the site was once a sanitary landfill. He estimated that a substantial portion of this landfill consisted of organic as opposed to inorganic matter. He stated that, based on his estimate, the quantity of organic landfill on the site would violate the Village of Riverwoods' ordinance which regulates sanitary landfills.

The issue of organic as opposed to inorganic fill material is highly relevant with regard to the property's suitability for construction as well as the pollution potential of the site. Mr. Koenen had been examined outside the presence of the jury in order to establish the admissibility of his testimony. At that time he explained that inorganic fill material would compress at a much faster rate than organic material. The substance of subsequent expert testimony indicates that this faster compression rate would facilitate less complicated construction procedures when building upon the site. Mr. Koenen also testified that the decomposition of the organic fill material produces a byproduct known as leachate, a pollutant. He stated that there is always a probability that some leachate will leave the landfill. Although he explicitly stated that the pollution of adjacent sites would occur regardless of whether or not a clay liner surrounded the landfill, it appeared from his subsequent testimony that the construction of such a liner would either impede or possibly even prevent such pollution. Mr. Koenen testified both in and outside the presence of the jury that, based on the soil borings, he could not give an opinion as to whether the sides of the landfill contained a clay liner. Mr. Koenen did state, outside the presence of the jury, that, to the best of his knowledge, there was no leachate entering the river. Further, he had no opinion as to whether leachate would enter the river in the future. The trial court did not allow admission of Mr. Koenen's testimony with regard to the probability of pollution from the landfill.

William DeBruler, a real estate appraiser and developer, was called by the plaintiff as a valuation witness. Mr. DeBruler testified that the highest and best use of the subject property would be for real estate investment based on a reasonable probability that the property would be rezoned for commercial use, explaining that the best use would be

commercial and, consequently, one would invest in the property with that use in mind. Mr. DeBruler concluded that, in light of the commercial characteristics of surrounding properties, there was a reasonable probability that the property would be rezoned for commercial use. He stated that based on the reasonable probability of rezoning, the physical composition of the soil, the shape of the property and the available utilities, the highest and best use of the subject property before and after the taking would be for a single commercial user. With these considerations in mind he determined that the fair cash market value of the entire 11-acre property, as of July 5, 1974, would be $110,000. He further determined that the value of the six-acre take would be $1,000 as of July 5, 1974. In making this determination he considered the factors listed above as well as the fact that three to four acres of the take is subject to flooding and much of it is sanitary landfill which will be subject to compression for 20 to 30 years before settlement is completed. He also determined that there would be no damage to the remainder after the take.

Plaintiff's last valuation witness was Herbert F. Harrison, a real-estate appraiser. Mr. Harrison stated that the highest and best use of the subject property would be as a real estate investment with a probability of commercial use. The commercial character of the surrounding area would indicate a probability of rezoning for commercial use but the soil composition and shape of the property would make it best suited for a single commercial user. Mr. Harrison valued the subject property as of July 5, 1974, at $100,000. The value of the take, in his estimation, was only $1,500 due to the soil composition and lack of utility to the property as a result of its location within a flood plain. He further determined that there would be no damage to the remainder of the subject property as the area taken would not even have ancillary use to the remainder.

Defendant's first witness, Mr. Rolf C. Campbell, a city planning and zoning consultant, initially outlined the zoning characteristics of the surrounding property through use of demonstrative exhibit No. 6. He determined that, based upon the commercial character of the surrounding property, the probability of rezoning to commercial use and the characteristics of the subject property, the highest and best use of the subject property would be for commercial-recreational use. He also stated that the soil borings (plaintiff's group exhibit No. 5) were not specific enough to determine the composition of the whole site. He concluded that after the take the highest and best use of the remainder would be for commercial purposes as distinguished from commercial-recreation purposes.

The bulk of Mr. Campbell's testimony focused on a concept for development of the property which his company prepared in 1972, two years prior to the take. The four phases of the concept, which entailed a

marine sporting goods store, a restaurant, and a marina, constituted defendant's group exhibit No. 4. He stated that this concept was merely an indication of one of the possible uses for which the property might be developed.

Defendant was allowed to enter into evidence the sale of an allegedly comparable piece of property (the Hank property) located to the north of and immediately adjacent to the subject property. We discuss its admissibility later.

Defendant's last valuation witness, Mr. Fred R. Tadrowski, was employed as a real estate appraiser and consultant. He testified that the highest and best use of the property would be commercial-recreational or commercial based on a reasonable probability of rezoning. This opinion was founded upon the size, soil composition, and location of the property as well as the availability of utilities, the flood plain and the zoning of surrounding areas. Mr. Tadrowski also considered the development concept tendered by the owner. He determined that the value of the total property would be $175,000, the market value of the part taken would be $75,000, and the damages to the remainder would be $15,000. The property would be damaged in that it was reduced in size, it could no longer be developed as river front property, and its highest and best use after the take would be commercial. Mr. Tadrowski was also dubious about the organic composition of the landfill due to the soil borings which indicated organic material in borings one and two and sanitary landfill in borings three through six.

■■ Plaintiff initially contends that the trial court abused its discretion in admitting into evidence the sale of the Hank property as a comparable sale. In examining the comparability of this sale, we note that no fixed or general rule may be laid down which governs the degree of similarity that must exist between the property sold and that condemned to make evidence of the sale admissible. The admissibility of such evidence must be determined by the trial judge within his discretion and based on the facts and circumstances of each particular case. (*City of Evanston v. Piotrowicz* (1960), 20 Ill. 2d 512, 522.) The supreme court has recognized that "similar" does not mean "identical," but means having a resemblance, and the properties may be similar for purposes of comparison although each possesses various points of difference; whenever there is a reasonable basis for comparison between the properties, evidence of the sale is not incompetent, and the dissimilarities between those properties, which are declared to the jury, would affect the weight and value of the testimony rather than its competency. *City of Evanston v. Piotrowicz.*

In the instant case, the Hank property was sold in April of 1972 for a price of $80,000. The property consisted of 13.3 acres and was located to the north of and immediately adjacent to the subject property; it has 425

feet of frontage along Milwaukee Avenue as compared with 91 feet for the subject property; and it is approximately six feet lower than the 11-acre subject property. The Hank property either abuts or extends into the Des Plaines River depending upon the shifting of the river, as does the subject property. Further, defendant's valuation witness testified that 10 of the 13.3 acres of the Hank property were located in the flood plain of the Des Plaines River as opposed to 3.67 acres of the subject property. Two acres of the Hank property were zoned commercial and the balance was zoned residential, whereas the entire subject property was zoned residential.

■■ Plaintiff urges that the subject property contained a sanitary landfill whereas the Hank property was not shown to contain such a fill. Although the existence of the landfill might affect the suitability for construction on the subject property, there is no evidence of any substantial pollution potential as is urged by the plaintiff. Joseph Koenen could not give an opinion as to whether the landfill was polluting the Des Plaines River or whether it would do so in the future. Additionally, plaintiff has misconstrued the statements in an Environmental Protection Agency letter which analyzed the pollution potential of the site. The letter indicated that, based on the information supplied to the agency by Lake County, there is very little potential hazard of pollution. In any event, the differences between the two properties with regard to the landfill were adequately pointed out to the jury and, as such, they affect the weight and value of the testimony rather than its competency. *Lake County Forest Preserve District v. Reliance Standard Life Insurance Co.* (1975), 29 Ill. App. 3d 145, 149-50.

Plaintiff also urges that the Hank property contained three buildings at the time of the sale and that two of the 13 acres were zoned commercial, whereas none of the subject property is so zoned. Defendant contends that the buildings were dilapidated and subsequently removed by the new owner. The fact that improvements existed on the Hank property would go to the weight rather than the admissibility of the sale. (*Department of Public Works & Buildings v. Lankford* (1965), 65 Ill. App. 2d 133.) Similarly, the fact that two acres of the Hank property were zoned commercial would not affect the admissibility of the sale, particularly where there was a reasonable probability that subject property would be rezoned commercial. (*Morton Grove Park District v. American National Bank & Trust Co.* (1976), 39 Ill. App. 3d 426.) The fact that the Hank property was sold two years prior to the filing of the petition for condemnation would also not affect its admissibility. *Forest Preserve District v. Kelley* (1979), 69 Ill. App. 3d 309.

We note also that the trial court considered and rejected the admission of a 1970 sale of 3.68 acres of property located approximately 200

feet from the subject property. This property did not border on the Des Plaines River and was zoned entirely for commercial use. Although this property contained a landfill, there was no showing of soil composition.

On the first day of trial, plaintiff submitted a motion to amend its petition to reduce the taking from a fee to an easement pursuant to section 5 of the Eminent Domain Act. Section 5 provides, *inter alia*, that "[a]mendments to the petition, or to any paper or record in the cause, may be permitted whenever necessary to a fair trial and final determination of the questions involved." (Ill. Rev. Stat. 1977, ch. 47, par. 5.) Plaintiff contends that the trial court's denial of the motion due to lack of timeliness constitutes reversible error.

Plaintiff urges that this court's decisions in *Illinois State Toll Highway Authority v. Chicago Title & Trust Co.* (1976), 37 Ill. App. 3d 355, and *Department of Public Works Buildings v. Greenlee* (1965), 63 Ill. App. 2d 425, are dispositive of this issue. The basis of this court's holdings in *Toll Highway* and *Greenlee* was that the plaintiff had not, by possession, interfered with respondent's access rights prior to the amendment and those access rights had not been determined in the quick-take orders. Thus, had plaintiff, in the present case, simply attempted to modify the access rights in the petition, such an amendment might have been allowable. Plaintiff, in the present case, did attempt a "unilateral stipulation" regarding open access, but later withdrew that stipulation.

In the instant case, the amendment would not involve a mere alteration in access rights, but rather a complete change in the nature of the taking. Although the quantity of land taken would not have been altered, the taking itself would have been modified from a fee simple to a forest preserve district easement for open space and flood control.

■■ As a general rule the measure of compensation for land taken in condemnation proceedings is the fair cash market value for the highest and best use for which it is available. (*City of Chicago v. Equitable Life Assurance Society* (1956), 8 Ill. 2d 341.) In contrast, the measure of damages to the part of land upon which an easement is impressed is the depreciation in fair market value thereof caused by its subjection to the condemnor's superior right to use the land. (*Peoples Gas Light and Coke Co. v. Buckles* (1962), 24 Ill. 2d 520.) Clearly, the valuation may be so radically different as to change the entire nature of the case. See Illinois Eminent Domain Practice §10.21 (Ill. Inst. Cont'g Legal Ed. 1979); Nichols, Law of Eminent Domain §12.41(2) (Sackman ed. 1979).

■■ With these rules in mind, we believe that the trial court acted within its discretion in concluding that the potentially substantial valuation difficulties in assessing an easement rendered plaintiff's motion to amend untimely. Unquestionably, the power to allow amendments under section

5 of the Eminent Domain Act is to be exercised liberally in favor of allowing such new pleadings. (*Illinois State Toll Highway Authority v. Chicago Title and Trust Co.* (1976), 37 Ill. App. 3d 355. However, it is well established in Illinois that the discretion of the trial court in considering whether to allow an amendment is broad and will not be upset absent some clear showing of abuse. (*Mundt v. Ragnar Benson, Inc.* (1974), 18 Ill. App. 3d 758, *aff'd* (1975), 61 Ill. 2d 151.) On the first day of trial an amendment should not ordinarily be permitted to set up matters of which the pleader had full knowledge at the time of interposing the original pleading, and no excuse is presented for not putting its substance in the original pleading. This is particularly true where the amendment is prejudicial or would alter the nature and quality of proof required to defend. *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159.

■ In the instant case the petition for condemnation was filed on July 5, 1974, and the cross-petition for damages was filed on December 20, 1976. Nevertheless, the plaintiff did not attempt to amend its petition until the first day of trial on September 18, 1978. Where no excuse was proffered for the delay in amending the petition, the trial court was clearly well within its discretion in denying the motion to amend on the basis that it was prejudicial to the defendant and was not timely.

The cases cited by plaintiff regarding amendments made during trial are clearly inapposite. In both *Union Electric Power Co. v. Sauget* (1953), 1 Ill. 2d 125, and *Department of Public Works & Buildings v. King* (1969), 111 Ill. App. 2d 357, the defendants were clearly not surprised or prejudiced by the proposed amendment as, in each case, they had knowledge of the subject matter of the amendment prior to trial. Such is not the situation in the case at bar.

Plaintiff's final contention is that the trial court erred in admitting defendant's group exhibit No. 4 into evidence. Exhibit No. 4 consisted of a series of "concept sketches," prepared in 1972, which depicted a possible use of the subject property as a commercial-recreational site. The four "phases" of the concept, prepared two years prior to the filing of the condemnation petition, depicted a sports center and marina sales center specializing in, *inter alia*, sporting goods sales and boat rentals.

Mr. Rolf C. Campbell, a city planning and zoning consultant, under whose direction the sketches had been prepared, testified for the defendant. After explaining the zoning characteristics of the property surrounding the subject site, Mr. Campbell concluded that the highest and best use for the subject property would be as a commercial-recreational site. Mr. Campbell based his determination on the zoning characteristics of the surrounding community as well as the unique capabilities of the subject site. Mr. Campbell further explained that group

exhibit No. 4 represented a series of graduated phases depicting possible use of the subject site as a sports center. He indicated that exhibit No. 4 was a concept for development of the site which was merely an indication of one of the possible uses of the property.

On cross-examination the plaintiff elicited several facts from Mr. Campbell upon which the plaintiff bases the contention that the four-phase concept is inadmissible. Although the village of Riverwoods' ordinances contained a commercial-recreational zoning classification, no property had been designated with that zoning classification as of the filing date of the condemnation petition. Mr. Campbell and Mr. Tadrowski did note three properties, located within a mile of the subject property, which were used or might be used for recreational purposes under other zoning classifications. In any event, it is established in Illinois that once some type of rezoning has been determined to be reasonably probable, witnesses may then testify as to a highest and best use under a less restrictive zoning classification. (*Morton Grove Park District v. American National Bank & Trust Co.* (1976), 39 Ill. App. 3d 426, 432.) Here, both plaintiff's and defendant's witnesses testified as to the reasonable probability that the subject site would be rezoned for commercial use.

Mr. Campbell's testimony also indicated that the four-phase concept might not have been in compliance with village of Riverwoods' zoning ordinances which require a 200-foot lot frontage for commercial buildings as well as only one main building per lot. The subject site contained a 91-foot frontage on Milwaukee Avenue, and the concept included a main shopping center and an unattached floating restaurant. Mr. Campbell explained that the restaurant would merely be ancillary to the main building, and that he believed that a variance for the frontage requirements could be obtained.

■■ It is well established that the admissibility of this type of evidence depends entirely upon the purpose for which it is offered and to which it is limited by the court. If the object of such a plan is to enhance the damages, by showing that the plan would be a profitable investment, then the testimony would clearly be inadmissible. If, on the other hand, the plan is offered merely as an illustration of one of the uses to which the property is adapted, or, in other words, by way of showing the capabilities of the property, and it is expressly limited by the court to such object, there would be no error in admitting it. (*Chicago & Evanston R.R. Co. v. Blake* (1886), 116 Ill. 163, 167-68.) Unquestionably, a pivotal factor in determining the admissibility of the plan would be whether the development was actually contemplated by the owner or whether it was largely an imaginary use. (*Sexton v. Union Stockyard Co.* (1902), 200 Ill.

244.) The admissibility of such evidence is within the broad discretion of the trial court and the court's decision should not be overturned absent an abuse of that discretion. *Department of Public Works & Buildings v. Lambert* (1952), 411 Ill. 183, 193.

In *Department of Conservation v. Aspegren Financial Corp.* (1977), 47 Ill. App. 3d 118, *aff'd* (1978), 72 Ill. 2d 302, this court sustained the trial court's determination that defendant's "preliminary concept," a plan to develop his property into a "residential-recreation" type of community, should not be admitted into evidence in a condemnation proceeding. Defendant contended that he should be allowed to introduce the plans in order to show the distinctive characteristics of the land which he intended to exploit, making it more valuable than adjacent land, and that he had been frustrated in so developing the land due to the State's premature announcement of its plans to condemn the area in question. This court concluded that the preliminary concept should not be considered as a basis for establishing a unique value in the condemned land and the immediate abandonment of these plans following the State's announcement of its intention to condemn should not be an element of damage in the eventual taking. In contrast, in the case at bar, the preliminary concept was offered as merely one use for which the land would be adaptable, although Mr. Campbell did state that the highest and best use of the land would change from commercial-recreational to commercial as a result of the take due in part to loss of river frontage and reduction in size of the land.

The elements of damage here may be distinguishable from those in *Aspergren*. The defendant in *Aspergren* attempted to characterize the condemned land as unique above all others in light of its singular adaptability to his preliminary concept. In contrast, in the case at bar, the defendant merely proposed to show one possible use of the land based on its particular characteristics. Further, the defendant in *Aspergren* attempted to include the frustration of his ability to so develop the land as an element of damages, whereas the defendant here merely showed the reduced capabilities of the remaining land after the take.

■ *Park District of Highland Park v. La Salle National Bank* (1976), 36 Ill. App. 3d 146, cited by plaintiff, is not in point. In *Highland Park* the court determined that a plat of land showing a certain manner of subdividing the land into lots would be inadmissible where (1) the plat was not of record; (2) the land was not surveyed into lots according to the plats; (3) there was no certainty that it would be or had become an actual plat of that land; and (4) the plat was not even contemplated before the suit was brought. This court emphasized the fact that the plat was prepared only one week before trial and almost three years after the condemnation suit

had been commenced. Further, the park district had conceded that the highest and best use of the land would be for single-family residential purposes and, therefore, the sole purpose of introducing the plat into evidence would have been to show that eight single-family dwellings would be a more profitable investment than five, thereby enhancing the damages. In contrast, in the case at bar, the concept for development had been prepared two years prior to the filing of the condemnation petition, and the plaintiff refused to recognize the potential commercial-recreational use of the property. We also note that the trial court denied admission of defendant's exhibit No. 5, prepared shortly before trial, which depicted a completed and modified concept encompassing the four phases of exhibit No. 4. Under these circumstances, we cannot say that the trial court abused its discretion in admitting defendant's exhibit No. 4.

■■ Finally, even the improper admission or exclusion of value evidence will not constitute reversible error when there is other evidence of value on both sides and the jury has the opportunity to weigh the conflicting evidence. (*Trustees of Schools v. La Salle National Bank* (1961), 21 Ill. 2d 552, 557.) In the present case the jury viewed the property and heard valuation testimony from three other witnesses. The jury's determination that the value of the take was $30,000 and the damage to the remainder totaled $10,000 was well within the range of the valuation testimony presented. Consequently, even if the admission of the concept did constitute error, its admission is not sufficient to justify reversal of the trial court's judgment.

The decision of the trial court is accordingly affirmed.

Affirmed.

NASH and UNVERZAGT, JJ., concur.